Faisal Gill (SBN 263416)
Gill Law Firm
11330 Ventura Blvd
Studio City, CA 91604
310-418-6675
202-318-5331 (fax)
Fgill@glawoffice.com

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PULHAM HOLDINGS, LTD<br>Trident Chambers<br>P.O. Box 146, Road Town<br>Tortola, British Virgin Islands | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiff | ) <br> ) | COMPLAINT |
| STEPAN MARTIROSIAN<br>Armenia, Armavir Region,<br>Vagarshapat (Achmiadzin),<br>Chobankara Highway, ARMAVIR<br>penal institution, Ministry of<br>Justice of the Republic of Armenia | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| WILLIAM WESTWOOD A/K/A<br>REMINGTON CHASE<br>4316 Marina City Drive<br>Unit 102G<br>Marina Del Rey, CA 90292 | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| VALENTIN S. GASPARYAN<br>1741 Hauser Blvd<br>Los Angeles, CA 90019 | ) <br> ) <br> ) <br> ) | |
| ENVISION ENTERTAINMENT, INC.<br>C/O Business Filings Inc,<br>Registered Agent<br>108 West 13th Street<br>Wilmington, DE 19801 | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants | | |

1

**NATURE OF ACTION**

1. This action is brought under 18 USC § 1962 et. al, Racketeer Influenced and Corrupt Organization Act, whereby Defendants WILLIAM WESTWOOD a/k/a REMINGTON CHASE (hereinafter "WESTWOOD"), STEPAN MARTIROSIAN (hereinafter "MARTIROSIAN"), ENVISION ENTERTAINMENT, INC (hereinafter "ENVISION") and operated as an enterprise to defraud Plaintiff PULHAM's of its investment money only to invest themselves.

2. Defendants presented to Plaintiff fictious companies to show that Defendant ENVISION had rights to invest in movies, then they would convince Plaintiff to purchase those rights through an assignment agreement with ENVISION, then Plaintiff would make the investment through a foreign wire transfer which would go to ENVISION to be held in "escrow."  After the investment was made, Defendants would represent other fictitious companies to show that those companies wanted to purchase those rights for a hefty profit.

3. Once Plaintiff sold its rights in those movies to those companies, then Defendants would take the money and invest in those movies themselves and keep the profits.

4. At all times, Defendants knew the contracts to be fictitious.

5. When Plaintiff inquired about its money, Defendants made up an elaborate story about an investment with the company Hasbro.  Even going so far as to show contracts with Hasbro.

6. At all times Defendants had the intention to operate a continuous racketeering enterprise to defraud the Plaintiff of its money.

**PARTIES**

2

7. Plaintiff, PULHAM LTD ("PULHAM"), is a company registered in the British Virgin Islands.

8. Defendant, MARTIROSIAN, is an individual who is a permanent resident of the United States and citizen of Armenia.

9. Defendant, WESTWOOD, is an individual resident of the state of California.   Upon information and belief, Defendant WESTWOOD has changed his name to REMINGTON CHASE.

10. Defendant GASPARYAN is an individual resident of the State of California and citizen of the United States.  Defendant GASPARYAN is the nephew of Defendant MARTIROSIAN

11. Defendant, ENVISION ENTERTAINMENT, Inc ("ENVISION"), is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 4316 Marina City Drive, Marina Del Rey, CA 90292.

## JURISDICTION AND VENUE

12.  This court has jurisdiction under 18 USC § 1962 et al, Racketeer Influenced and Corrupt Organization Act.

13. This Court has personal jurisdiction over Defendant ENVISION because it is a corporation organized and existing under the laws of the State of Delaware with its principal office in this District.

14. This Court has personal jurisdiction over Defendant MARTIROSIAN because he is a permanent resident of the United States and a resident of the State of California who was residing in the State of California during the time of the events.

15. This Court has personal jurisdiction over Defendant WESTWOOD because he is a citizen of the United States residing in the State of California.

16. This Court has personal jurisdiction over Defendant GASPARYAN because he is a citizen of the United States residing in the State of California

17. Venue is proper because Defendants reside within the district, pursuant to 28 USC § 1391(c).

## FACTUAL BACKGROUND

18. Plaintiff PULHAM is a company organized under the laws of British Virginia Islands. Its ultimate beneficial owner is Vitali GRIGORYANTS.

19. MARTIROSIAN is of Armenian descent and a permanent resident of the United States, who represented himself as having several contacts within the movie industry in Hollywood, CA.

20. GRIGORYANTS met MARTIROSIAN in Russia through a mutual acquaintance in the early 1990's.

21. Soon thereafter, GRIGORYANTS hired MARTIROSIAN as a Director of one of his ventures named Vitoil Corporation, a corporation with offices in the state of California that was established to invest in real estate in the United States.

22. WESTWOOD is a citizen of the United States and a business associate of MARTIROSIAN.

23. In 2010, MARTIROSIAN proposed to GRIGORYANTS an opportunity to invest in the production of live-action theatrical feature films in the United States.

4

24. MARTIROSIAN and WESTWOOD introduced GRIGORYANTS to ENVISION ENTERTAINMENT and represented ENVISION as an experienced company within the movie production business.

25. MARTIROSIAN and WESTWOOD introduced an individual named Jeffrey Howard as the founder and director of ENVISION.

26. MARTIROSIAN was the sole owner and director of ENVISION but did not reveal this information to GRIGORYANTS.

27. WESTWOOD also held the position of director in ENVISION, but this was not revealed to GRIGORYANTS.

28. After several meetings, conversations and exchange of documentation regarding the viability of these ventures and the movie industry, PULHAM agreed to provide investment to pursue the ideas proposed by MARTIROSIAN, WESTWOOD and Howard.

29. On April 5, 2011 PULHAM and ENVISION entered into a "Production Financing Agreement", in which PULHAM would provide a maximum of $30M USD to fund the production of ten films. (Exhibit 1).

30. $3 million was to be invested in each film.  An "Enclosure" would be executed detailing each film and the level of investment as the projects matured.

31. In paragraph 5 of the "Production Financing Agreement," ENVISION was entitled to a "Producer Fee" totaling $1,000,000 based on $100,000 per film.

32. The payment arrangement stated that $300,000 will be payable upon execution of the document, which is corroborated by the wire on March 28, 2011 for $300,000 from PULHAM's account to ENVISION's account number ending in 6000 at Comerica Bank.

33. The $700,000 made payable in three equal monthly installments are corroborated by wires on May 27, 2011 for $233,333.33, June 17, 2011 for $2,233,333.33, and July 18, 2011 for $233,333.33 from PULHAM to ENVISION's account number ending in 6000 at Comerica Bank.

**FREELANCERS**

34. On April 27, 2011, PULHAM and ENVISION signed an Assignment Agreement for the movie "Freelancers" with a proposed investment of $3,000,000 USD.

35. ENVISION had presented an Investment Agreement dated January 21, 2011 between Georgia Film Fund Three LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively, as evidence to demonstrate that ENVISION had legal rights to the production of the film.

36. Between December 15, 2010 and April 26, 2011, there were six (6) wires, and Waikoloa Mauka, a company owned by GRIGORYANTS, also issued a check for $173,905 USD for an aggregate investment of $2,999,905 USD.

37. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp. However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

38.  The Assignment Agreement states that PULHAM is to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

COMPLAINT

39. A report from Freeway CAM BV, the company designated to collect and distribute all revenue from the Freelancers, dated July 3, 2017, states that ENVISION invested $3,000,000 and was to recoup $3,600,000 but in second priority for the recoupment of initial investment and seventh priority for the gross revenues as opposed to first priority.

40. The report also stated that ENVISION had 45% interest in gross revenues and MARTIROSIAN had an additional 5%.  These facts were not disclosed to PULHAM.

41. On or about March 24, 2012, MARTIROSIAN and WESTWOOD represented that they found a buyer for the Assignment rights to the movie "Freelancers." On March 24, 2012, a Purchase Agreement between PULHAM and a fictitious company called KCR Camelot Entertainment, LLC, with ENVISION acting in the capacity of escrow agent, was signed.

42. MARTIROSIAN represented that KCR CAMELOT ENTERTAINMENT, LLC, transferred $4,100,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

43. MARTIROSIAN, ENVISION AND WESTWOOD then themselves invested in "Freelancers" through Envision.

44. ENVISION, MARTIROSIAN and WESTWOOD made $2,999,905 USD from "Freelancers."

**FIRE WITH FIRE**

45. On May 27, 2011, PULHAM and ENVISION signed an Assignment Agreement for the movie "Fire with Fire" with a proposed investment of $4,000,000 USD.

46. ENVISION presented an Investment Agreement dated March 17, 2011, between Georgia Film Fund Four LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively, as evidence to demonstrate that ENVISION had legal rights to the production of the film.

47. On May 26, 2011, PULHAM transferred $4,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

48. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp. However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

49. The Assignment Agreement states that PULHAM is to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity

50. A report dated August 24, 2017, from Freeway CAM BV, the company designated to collect and distribute all revenue from the film,  states that ENVISION invested $3,850,000 USD and was to recoup $4,620,000 USD but was in sixth priority for the recoupment for the gross revenues as opposed to first priority.

51. The report also stated that ENVISION had 40% interest in gross revenues. These facts were not disclosed to PULHAM.

52. The Freeway reports conveys that $426,199 USD was paid to ENVISION, which PULHAM never received.

8

53. On or about December 5, 2011, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "Fire with Fire." On December 5, 2011, a Purchase Agreement between PULHAM and a fictitious company called KCR Camelot Entertainment, LLC, with ENVISION acting in the capacity of escrow agent, was signed.

54. MARTIROSIAN represented that KCR Camelot Entertainment, LLC, transferred $8,500,000 USD to ENVISION

**END OF WATCH**

55. On July 21, 2011, PULHAM and ENVISION signed an Assignment Agreement for the movie "End of Watch" with a proposed investment of $2,500,000 USD.

56. ENVISION had presented an Investment Agreement dated July 21, 2011, between Exclusive Media Distribution LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively, as evidence to demonstrate that ENVISION had legal rights to the production of the film.

57. On July 22, 2011, PULHAM transferred $2,500,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

58. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard. The document is also notarized by an individual named Robert R. S. Propp. However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

COMPLAINT

59. The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

60. A report from Fintage Collection Account Management B.V., the company designated to collect and distribute all revenue from the film, dated November 28, 2012, states that ENVISION invested $1,555,000 USD and was to recoup $1,555,000 USD but in sixth priority for the recoupment for the gross revenues as opposed to first priority.

61. The report also stated that ENVISION had 25% interest in gross revenues. These facts were not disclosed to PULHAM.

62. The report from Fintage Collection Account Management B.V. dated January 14, 2013, states that ENVISION was repaid $1,055,000 USD; and subsequently, the report dated December 13, 2013, states that ENVISION received the remaining $500,000 of the investment.

63. On or about May 29, 2012, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "End of Watch." On May 29, 2012, a Purchase Agreement between PULHAM and a fictitious company called Canal Group, LLC, with ENVISION acting in the capacity of escrow agent was signed.

64. MARTIROSIAN represented that Canal Group, LLC, transferred $11,500,000 USD to ENVISION's account number ending in 1715 at Chase Bank.

**I ALEX CROSS**

65. On July 29, 2011, PULHAM and ENVISION signed an Assignment Agreement for the movie "I Alex Cross" with a proposed investment of $4,000,000 USD.

66. ENVISION had presented an Investment Agreement dated July 21, 2011, between IAC Productions LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively, as evidence to demonstrate that ENVISION had legal rights to the production of the film.

67. On July 29, 2011, PULHAM transferred $4,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

68. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp.  However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

69. The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

70. A report from Fintage Collection Account Management B.V., the company designated to collect and distribute all revenue from the film, dated April 14, 2014, states that ENVISION invested $3,375,000 USD and was to recoup $3,375,000 USD  in the fourth priority and seventh priority distribution of gross revenues as opposed to first priority.

71. The report also stated that ENVISION had 18.75% interest in gross revenues.  These facts were never disclosed to PULHAM.

72. The report from Fintage Collection Account Management B.V. dated January 27, 2017, states that ENVISION received $256,571 USD.

COMPLAINT

73. On or about May 29, 2012, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "I Alex Cross." On May 29, 2012, a Purchase Agreement between PULHAM and a fictitious company called Canal Group, LLC, with ENVISION acting in the capacity of escrow agent, was signed.

74. MARTIROSIAN represented that Canal Group, LLC, transferred $15,600,000 USD to ENVISION's account number ending in 1912 at Chase Bank.

**FROZEN GROUND**

75. On October 3, 2011, PULHAM and ENVISION signed an Assignment Agreement for the movie "Frozen Ground" with a proposed investment of $4,000,000 USD.

76. ENVISION had presented an Investment Agreement dated September 26, 2011, between Georgia Film Fund Five LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

77. On October 3, 2011, PULHAM transferred $4,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

78. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp. However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

79. The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

12

80. A report from Freeway CAM BV, the company designated to collect and distribute all revenue from the film, dated December 2, 2014, states that ENVISION invested $3,695,000 USD and was to recoup in the eight priority and fourteenth priority distribution of gross revenues as opposed to first priority.

81. The report also stated that ENVISION had 20% interest in gross revenues.  These facts were never disclosed to PULHAM.

82. On or about May 29, 2012, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "Frozen Ground." On May 29, 2012, a Purchase Agreement between PULHAM and a fictitious company called Canal Group, LLC, with ENVISION acting in the capacity of escrow agent was signed.

83. MARTIROSIAN represented that Canal Group, LLC, transferred $13,100,000 USD to ENVISION's account number ending in 1917 at Chase Bank.

**BROKEN CITY**

84. On October 21, 2011, PULHAM and ENVISION signed an Agreement titled "Enclosure No. 6 To Production Financing Agreement dated as of April 05, 2011" for the movie "Broken City" with a proposed investment of $8,000,000 USD.

85. ENVISION had presented an Investment Agreement dated October 3, 2011, between Georgia Film Fund Seven LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

86. On October 20, 2011, PULHAM transferred $8,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

COMPLAINT

87. MARTIROSIAN represented that on December 21, 2012, ENVISION acquired an additional twenty percent (20%) of the rights for the net profits of the movie from Georgia Film Fund Seven, LLC and Film Finances, Inc. for $2,500,000 USD.

88. On December 21, 2012, PULHAM purchased an additional ten percent (10%) of the rights for the Net Profits of the movie from ENVISION for $1,250,000 USD.

89. On December 21, 2012, PULHAM transferred $1,250,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

90. The aggregate amount transferred by PULHAM to ENVISION for the movie was $9,250,000 USD.

91. The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp.  However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

92. The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 50% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

93. A report from Freeway CAM BV, the company designated to collect and distribute all revenue from the film, dated May 11, 2017, states that ENVISION invested $8,700,000 USD and was to recoup in the eight priority.

94. The report also stated that ENVISION had 40% interest in gross revenues.  These facts were never disclosed to PULHAM.

COMPLAINT

**TOMB**

95. On March 19, 2012, PULHAM and ENVISION signed an Assignment Agreement for the movie "Tomb" with a proposed investment of $9,400,000 USD.

96. ENVISION had presented an Investment Agreement dated February 15, 2012 between Georgia Film Fund 12 LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

97. On March 16, 2012, PULHAM transferred $9,000,000 USD to ENVISION's account number 1894466000 at Comerica Bank, of which $7,000,000 USD was intended for investment into the movie "The Tomb," and $2,000,000 USD was transferred for the anticipated investment into a future movie titled "Empire State."

98. MARTIROSIAN and WESTWOOD stated the remaining $2,400,000 USD of the investment would be paid from the proceeds of sales of PULHAM's movies.

99. The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 40% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

100.      A report from Freeway CAM BV, the company designated to collect and distribute all revenue from the film, dated March 16, 2017, states that ENVISION invested a total of $14,699,060 USD and was to recoup in the seventh priority.

101.      The report also stated that ENVISION had 35% interest in gross revenues.  These facts were never disclosed to PULHAM.

_____

COMPLAINT

102.     On March 3, 2013, a Profit Participation Agreement was reached with Filmworks Group Ltd. and PULHAM to exchange profits for PULHAM's movies "Empire State" and "Tomb" for Filmworks movies "Slaughterhouse," "We Kill Monsters," "Day 38," and "November Man."

**EMPIRE STATE**

103.     On July 16, 2012, PULHAM and ENVISION signed an Assignment Agreement for the movie "Empire State" with a proposed investment of $6,000,000 USD.

104.     ENVISION had presented an Investment Agreement dated April 5, 2012, between Georgia Film Fund Fifteen LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

105.     On March 16, 2012, PULHAM transferred $9,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank, of which $7,000,000 USD was intended for investment into the movie "The Tomb," and $2,000,000 USD was transferred for investment into "Empire State."

106.     On July 13, 2012, PULHAM transferred $2,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

107.     MARTIROSIAN and WESTWOOD stated the remaining $2,000,000 USD of the investment would be paid from the proceeds of sales of PULHAM's movies.

**TWO GUNS**

108.     On April 1, 2012, PULHAM and Georgia Film Fund Fifteen LLC, , with George Furla and Jeffrey Howard as signatories respectively, and Universal Studios signed an

Investment Agreement for the movie "Two Guns" with a proposed investment of $16,700,000 USD. ENVISION was designated to transfer the funds.

109.    On May 15, 2012, PULHAM transferred $6,500,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

110.    MARTIROSIAN and WESTWOOD represented that on December 21, 2012, ENVISION and Georgia Film Fund Fifteen LLC signed a Memorandum of Agreement for ENVISION to purchase an additional twenty percent (20%) of the rights for the Net Profits of the movie from Georgia Film Fund Fifteen LLC for $11,880,000 USD.

111.    On December 21, 2012, PULHAM purchased additional ten percent (10%) of the rights for the Net Profits of the movie from ENVISION for $5,940,000 USD.

112.    On January 17, 2013, PULHAM transferred $5,940,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

113.    Collectively PULHAM was to receive "120% of the investment in the first priority and then 50% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

114.    A report from Freeway CAM BV, the company designated to collect and distribute all revenue from the film, dated December 8, 2017, states that ENVISION invested a total of $11,000,000 and was to recoup in the sixth priority.

115.    The report also stated that ENVISION had 33.11% interest in gross revenues. These facts were never disclosed to PULHAM.

17

**LONE SURVIVOR**

116.     On October 18, 2012, PULHAM and ENVISION signed an Assignment Agreement for the movie "Lone Survivor" with a proposed investment of $17,400,000 USD.

117.     ENVISION had presented an Investment Agreement dated July 26, 2012, between Georgia Film Fund 17 LLC and ENVISION, with George Furla and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

118.     Between August 14, 2012 and October 17, 2012, PULHAM transferred $12,500,000 USD in seven (7) wires to ENVISION's account number ending in 6000 at Comerica Bank.

119.     The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S. Propp.  However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

120.     The Assignment Agreement states that PULHAM was to receive "120% of the investment in the first priority and then 50% of all gross revenues from distribution and exploration of the Picture worldwide from all sources in perpetuity.

121.     A report from Freeway CAM BV., the company designated to collect and distribute all revenue from the film, dated December 19, 2017, states that ENVISION invested $7,500,000 USD and was to recoup $7,500,000 USD in the third priority and fifth priority distribution of gross revenues.

18

---

122.    The report also stated that ENVISION had 18.2% interest in gross revenues. These facts were never disclosed to PULHAM.

123.    The report from Freeway CAM BV also stated that ENVISION received $5,476,197.21 USD.

124.    On or about March 30, 2014, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "Lone Survivor." On March 30, 2014, a Purchase Agreement between PULHAM and a fictitious company called Canal One, LTD, with ENVISION acting in the capacity of escrow agent, was signed.

125.    MARTIROSIAN represented that Canal Group, LLC, transferred $18,100,000 to ENVISION's Escrow account at Comerica Bank.

126.    There was no transfer of $18,100,000 by Canal Group, LLC to ENVISION. MARTIROSIAN fabricated the story up to entice PULHAM to invest more money. Neither Envision, nor Pulham received $18,100,000 from Canal Group LLC.

**HASBRO SCHEME**

127.    On May 31, 2012, PULHAM and ENVISION entered a Multi-Picture Financing Agreement for PULHAM to have the opportunity to finance up to ten (10) motion pictures. PULHAM agreed to invest $50,000,000 USD to pay Hasbro Inc. for advance "right fees" to secure the rights to the games and pictures.

128.    The Agreement stated that the proceeds from the sales of the movies "Freelancer," "Fire with Fire," "End of Watch," "I, Alex Cross," and "Frozen Ground," totaling $49,970,000 USD would be utilized for this investment. The remaining $300,000 USD was

19

to be transferred by PULHAM.  All money was to be transferred to ENVISION's account ending in 4215 at Chase Bank.

129.     On August 14, 2014, Hasbro Films, Randall Emmett / George Furla Film LLC, ENVISION, and PULHAM signed a Financing Agreement for PULHAM, with Randall Emmett and Jeffrey Howard as signatories respectively,  to participate in the financing of ten (10) future live-action theatrical production based on Hasbro properties for an investment of $50,000,000 USD.

130.     MARTIROSIAN and WESTWOOD never intended for PULHAM to invest $50,000,000 USD for the future live-action theatrical production with Hasbro Inc. and this was a fictitious investment to prevent PULHAM from requesting the $49,700,000 USD in alleged proceeds from the sale of the other movies.

### AND SO IT GOES

131.     On April 23, 2013, PULHAM and ENVISION signed an Assignment Agreement for the movie "And So it Goes" with a proposed investment of $2,650,000 USD.

132.     ENVISION had presented an Investment Agreement dated April 3, 2013 between ASIG Distribution LLC and ENVISION, with Mark Damon and Jeffrey Howard as signatories respectively,  as evidence to demonstrate that ENVISION had legal rights to the production of the film.

133.     On September 18, 2012, PULHAM transferred $2,000,000 to ENVISION's account number ending in 6000 at Comerica Bank.

134.     The Assignment Agreement on behalf of ENVISION is signed by somebody named Jeffrey Howard.  The document is also notarized by an individual named Robert R. S.

Propp.  However, on April 25, 2019, Propp signed a declaration in which he stated he did not notarize the document, nor has he met any individual by the name of Jeffrey Howard.

135.     On or about March 10, 2014, MARTIROSIAN and WESTWOOD represented that they had found a buyer for the Assignment rights to the movie "And So it Goes." On March 10, 2014, a Purchase Agreement between PULHAM and a fictitious company called AIG Holdings Inc., with ENVISION acting in the capacity of escrow agent, was signed.

136.     MARTIROSIAN represented that AIG Holdings Inc., transferred $4,100,000 USD to ENVISION's account at Comerica Bank.

137.     AIG Holdings was not a real company and no transfer ever occurred.

## CONVENTION

138.     On August 1, 2013, PULHAM entered into an Investment Agreement with Convention Production LLC, with George Furla and Jeffrey Howard as signatories respectively, for partial financing and profit-sharing rights for the feature film "Convention" with a proposed investment of $12,300,000 USD.

139.     Between December 17, 2012, and September 17, 2013, PULHAM transferred $10,100,000 USD in a total of four (4) wires to ENVISION's account number ending in 6000 at Comerica Bank for the feature film "Convention."

140.     On September 10, 2015, PULHAM signed a Purchase Agreement with C&C Productions LLC for exchange of profit-sharing rights of "Convention" for C&C Productions' rights of "Cocaine Cowboys."

**PIERRE-PIERRE**

141.        On August 1, 2013, PULHAM entered into an Investment Agreement with Pierre

Pierre LLC for partial financing and profit-sharing rights for the feature film "Pierre Pierre"

with a proposed investment of $6,600,000 USD.

142.        On April 17, 2012, PULHAM transferred $1,000,000 USD by wire into

ENVISION's account number ending in 6000 at Comerica Bank.  MARTIROSIAN and

WESTWOOD, fraudulently stated that $1,280,000 USD was paid by ENVISION from the

profits earned through the sale of PULHAM films.

143.        MARTIROSIAN and WESTWOOD knew this statement was false.

**SIN CITY**

144.        On October 10, 2013, PULHAM signed an Acquisition Agreement with Alastair

Financial Services LLC for partial financing and profit-sharing rights to "Sin City: A Dame

to Kill" with a proposed investment of $16,330,000 USD.

145.        Between December 17, 2012, and October 17, 2013, PULHAM transferred

approximately $15,230,000 USD in three (3) separate wires to ENVISON's account

number ending in 6000 at Comerica Bank for the movie "Sin City: A Dame to Kill"  of

which 2 wires in the amount of $7,700,000 USD to ENVISON's account number ending

in 6000 and $7,530,000 USD to the account number ending in 7326 of FFI-Sin City-2 Trust

Account LLC.

146.        On April 18, 2014, PULHAM and TWG Inc. signed a Mutual Assignment

Agreement in which PULHAM exchanged its rights to profits from the movie "Sin City:

A Dame to Kill" for TWG Inc.'s profit rights to the movie "Inversion."

147.     TWG Inc, was never a real company who owned any rights to the movie "Inversion."

**BASE FX LTD / BASE ANIMATION**

148.     In late 2014 and early 2015, MARTIROSIAN and WESTWOOD proposed to GRIGORYANTS that PULHAM should invest in a company specializing in the creation of visual and optical effects for the movie production industry.

149.     MARTIROSIAN and WESTWOOD further advised to open the company in Malaysia for financial tax benefits.

150.     MARTIROSIAN and WESTWOOD introduced Chris Bremble who owned an existing company named Base FX Ltd based in Beijing, China.

151.     On February 21, 2015, PULHAM, Base FX Ltd., and ENVISION entered into a Shareholder's Agreement for a company called Base Animation Malaysia, which was registered in the state of Colorado due to delays of registering in the country of Malaysia.

152.     Between February 2, 2015, and November 12, 2015, PULHAM transferred $6,000,000 USD in total of five (5) wires to Base Animation Malaysia's account numbers ending in 0198 and 0180 at Citibank.

153.     On or about February 13, 2015, WESTWOOD advised that he had registered Base Animation Malaysia SDNBHD in Malaysia under the registration number 11225811-V.

154.     An inquiry at the official website of the registrar of companies in Malaysia has shown that no such company was registered under the registration number 11225811-V.

COMPLAINT

## DISCOVERY OF FRAUD

155.     From 2015 to 2017, Plaintiff continued to inquire about the status of the profits that Defendants alleged to have made for Plaintiff through their investment.

156.     Finally, in or around the summer of 2017, Defendant WESTWOOD admitted to Plaintiff the entire scheme to defraud them of their investment.

157.     WESTWOOD revealed the fraudulent scheme to defraud Plaintiff through fictitious agreements and companies laid out in detail above.

158.     On June 6, 2019, WESTWOOD provided an affidavit in which he stated that MARTIROSIAN elicited the assistance of an individual who represented himself as HOWARD in order to provide legitimacy to ENVISION.

159.     WESTWOOD stated that MARTIROSIAN knew that GRIGORYANTS would not have invested in the financing of feature films if he knew that MARTIROSIAN was the sole owner of ENVISION and not HOWARD.

160.     WESTWOOD advised that MARTIROSIAN transferred the monies that were invested by PULHAM into ENVISION's account to many of his personal accounts, to include his account at the Bellagio Hotel and Casino in Las Vegas.

161.     WESTWOOD stated that MARTIROSIAN also transferred monies to his sister Bessy Martirosian's account.

162.     WESTWOOD stated the MARTIROSIAN also transferred monies to his business Prestigious Yachts registered in the Cayman Islands.

163.     MARTIROSIAN also transferred monies to GASPARYAN to start other businesses.

164.     At all times GASPARYAN was aware of what was taking place and being a director of ENVISION, assisted MARTIROSIAN to carry out the fraud scheme.

165.     At the direction of MARTIROSIAN, GASPARYAN often moved monies from ENVISION's accounts to various investment and personal accounts of MARTIROSIAN, including, but not limited to, MARTIROSIAN's accounts at the Bellagio Casino Hotel and the Aria Casino Hotel.

166.     No monies were ever transferred to PULHAM.

### COUNT I- Racketeer Influenced and Corrupt Organization
### 18 USC § 1962 et seq

167.     Plaintiff incorporates the allegations in paragraph 1-166 as if fully set forth herein.

168.     Plaintiff pleads this action of Racketeer Influenced and Corrupt Organization Act 18 USC § 1962(c) against Defendant Stepan MARTIROSIAN.

169.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff were involved in a well-planned widespread enterprise to steal money from PLAINTIFF.  Defendants would show a fraudulent agreement to show that a certain company had the movie rights to certain movies.  They would induce the Plaintiff into sending large amounts of money to ENVISION in order for ENVISION to purchase the movie rights from the company to further Plaintiff's investment.  Plaintiff would send the money through international wire transfers.  Then, Defendants would set up a fraudulent contract with a company to act as buyer for the movie rights.  Plaintiff, based on Defendants' fraudulent representations,

25

would then enter into a supposed agreement with that company to sell the movie rights. Defendants would then say that they were reinvesting the profits they made from the movie into the next movie.   Defendants would then, in certain transactions, take all or some Plaintiff's money and invest in the movies using the company Defendant Envision and keep the money returned to Envision for themselves. In other transactions, Defendants would never invest the Plaintiff's money and would keep it for themselves.

170.     Defendants were engaged in long term organized activity devised to deprive Plaintiff of its investment.

## **ENTERPRISE**

171.     Defendants are individuals capable of holding legal beneficial interest in property, therefore each Defendant is a person within the meaning of 18 USC § 1961(3).

172.     Defendant WESTWOOD was a partner of Defendant MARTIROSIAN and was introduced to the Plaintiff as someone who assists him in all his affairs.

173.     Jeffrey Howard is an individual that Defendant MARTIROSIAN introduced to Plaintiff as someone who is the founder of Defendant ENVISION.

174.     Defendant ENVISION was a company that was set up by both Defendant MARTIROSIAN and Defendant WESTWOOD to act as the conduit for taking investment in from Plaintiff.   They fraudulently told Plaintiff that Jeffrey Howard is the founder and owner in order to hide the true identity.

175.     Upon information and belief, Georgia Film Fund was a company presented by Defendant WESTWOOD and MARTIROSIAN to show the Plaintiff that it had movie rights to sell to Envision.

176.     KCR Camelot was a company represented by Defendants WESTWOOD and MARTIROSIAN to show Plaintiff that there was a company to whom they could sell their film rights.

177.     CANAL GROUP was a company that was represented by Defendants WESTWOOD and MARTIROSIAN to show Plaintiff that there was a company to whom they could sell their film rights.

178.     CANAL GROUP LTD, was a company represented by WESTWOOD and MARTIROSIAN to show Plaintiff that there was a company to whom they could sell their film rights.

179.     Defendant BASE ANIMATION was a company represented by WESTWOOD and MARTIROSIAN to get Plaintiff to give them money under the guise of investing in new movie animation technology.

180.     Defendant MARTIROSIAN AND WESTWOOD set up an enterprise by incorporating Defendant ENVISION, GEORGIA FILM FUND, KCR CAMELOT ENTERTAINMENT, CANAL GROUP, CANAL GROUP Ltd, and BASE ANIMATION, as an "association-in-fact."  The common purpose was to show Plaintiff that there were companies with movie rights to sell to Plaintiff and then once Plaintiff invested that there were companies to purchase the rights from Plaintiff.

181.     Defendants, MARTIROSIAN, WESTWOOD, GASPARYAN, and ENVISION, and GEORGIA FILM FUND, KCR CAMELOT ENTERTAINMENT, CANAL GROUP, CANAL GROUP Ltd, and BASE ANIMATION constitute an enterprise under RICO 18

USC § 1961(4) that is engaged in activities of which affect interstate and foreign commerce.

182.     Defendants MARTIROSIAN, GASPARYAN AND WESTWOOD conspired to steal $98,000,000 of PULHAM's investment and deprive them of any profits made from the production of movies PULHAM invested in.

**UNLAWFUL CONDUCT AND PATTERN OF RACKETEERING ACTIVITY**

183.     Defendants and others acting on their behalf have conducted the activities of fraudulently inducing Plaintiff to invest money through a pattern of racketeering activity in furtherance of their ongoing scheme to get Plaintiff to invest millions in movies only to divert Plaintiff's investment for their own personal use and investment.   This pattern of racketeering included the use of interstate and international wires to devise and execute a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises and the interstate transportation of property obtained by theft, conversion or fraud having a value of more than $5000.

184.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff and those acting on their behalf have unlawfully, knowingly and intentionally engaged in two or more acts indictable under the Federal Wire Fraud Statute under 18 USC § 1343, and the Federal Transportation of Stolen Property Statutes 18 USC §2314 and 2315.

185.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in

furtherance to defraud Plaintiff of its investment in the movie "Freelancers", money by doing acts, including, but not limited to the following:

    a.  On or about January 20, 2011, Defendants, to induce Plaintiff to invest, showed Plaintiff an Investment Agreement between Georgia Film Fund Three LLC and ENVISION for the movie "Freelancers."  ENVISION had a deal to purchase a portion of rights of the movie for an investment of $3 million.

    b.  On or about April 27, 2011, Plaintiff signed an "Assignment Agreement" with ENVISION whereby Plaintiff purchased ENVISION's rights in the movie for $3 million.

    c.  Plaintiff sent via foreign wires a total $2,826,000 USDto Envision:

        i.  December 15, 2010 - $90,000 USD
        ii.  January 13, 2011 - $295,000 USD
        iii.  February 15, 2011 - $1,100,000 USD
        iv.  March 15, 2011 - $970,000 USD
        v.  April 15, 2011 - $100,000 USD
        vi.  April 26, 2011- $271,000 USD

    d.  Waikoloa Mauka, a company owned by GRIGORYANTS, also issued a check for $173,905 USD for an aggregate investment of $2,999,905 USD.

    e.  A few months after the wires, Defendants informed Plaintiff that there was a buyer for their film rights for $4,100,00 USD thereby making a profit of $1,100,000 USD in just a year.

    f.  On March 24, 2012, Plaintiff executed a Purchase Agreement between Plaintiff and KCR Camelot Entertainment, LLC, with ENVISION as Escrow Agent, for $4,100,000 USD.

29

g.  Defendants then took the money from Plaintiff and invested the money for themselves in the movie Freelancers.

186.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Fire With Fire", money by doing acts, including, but not limited to, the following:

a.  Also, on March 17, 2011, Defendants brought another movie investment idea for the movie "Fire With Fire."  Defendants showed another Investment Agreement between Georgia Film Fund Four LLC and Envision.

b.  On May 27, 2011, Plaintiff executed an "Assignment Agreement" with ENVISION whereby for providing $4 million in financing, Plaintiff would receive 40% of the profits from the movie.

c.  On May 26, 2011, Plaintiff sent the $4,000,000 via foreign wire transfer.

d.  Defendants once again said there was a buyer for the movie rights to "Fire With Fire."  KCR Camelot Entertainment was willing to purchase the movie rights for $9,500,000 USD.

e.  On December 5, 2011, Plaintiff signed a Purchase Agreement between Plaintiff and KCR Camelot Entertainment, LLC, with ENVISION as Escrow Agent for $9,500,000 USD.

f.  Defendants represented there was an interstate wire transfer from KCR Camelot Entertainment for $9,000,000 USD to ENVISION'S Escrow account.

    g.   Subsequently, Defendants took the stolen $4 million investment and invested in "Fire With Fire" through ENVISION.

    h.   ENVISION purchased 40% of the profit rights of the movie.

187.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "End of Watch", money by doing acts, including, but not limited to, the following:

    a.   Also, on July 21, 2011, Defendants brought another movie investment idea for the movie "End of Watch." Defendants showed another Investment Agreement between Exclusive Media Distribution, LLC and ENVISION. ENVISION was to receive 120% of recoupment of its investment and 40% profits from the movie.

    b.   On July 22, 2011, Plaintiff executed an "Assignment Agreement" with ENVISION whereby for providing $2,500,000 USD in financing, Plaintiff would receive 120% recoupment of its investment and 40% of the profits from the movie.

    c.   On July 22, 2011, Plaintiff sent the $2,500,000 USD via foreign wire transfer.

    d.   Defendants once again said there was a buyer for the movie rights to "End of Watch." Canal Group was willing to purchase the movie rights for $11,500,000 USD.

    e.   On May 29, 2012, Plaintiff signed a purchase agreement with Canal Group to sell its rights in the movie "End of Watch" for $11,500,000.

COMPLAINT

f.   Once again, Defendants showed a fraudulent interstate wire transfer for $11,500,000 USD from Canal Group to ENVISION.

g.   Subsequently, Defendants took the stolen $2,500,000 USD investment and invested in "End of Watch" for themselves through Envision.

188.   Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "I Alex Cross", money by doing acts, including, but not limited to, the following:

a.   Defendants brought another investment opportunity to Plaintiff. Defendants showed Plaintiff an "Investment Agreement" between IAC Productions, LLC and Envision dated July 29, 2011, to invest in the movie "I Alex Cross."

b.   Once again, Plaintiff executed on July 29, 2011, an "Assignment Agreement" with Envision to invest $4,000,000 USD for the portion of movie rights to "I Alex Cross."

c.   On July 29, 2011, Plaintiff sent $4,000,000 USD through a foreign wire transfer to ENVISION.

d.   Defendants once again stated that there was a buyer for the movie 'I Alex Cross.'

e.   On May 29, 2012, Plaintiff executed a Purchase Agreement with Canal Group, LLC, with Envision as Escrow Agent, for $15,600,000 USD.

f.   Defendants represented that $15,600,000 USD was transferred via interstate wire transfer from Canal Group to ENVISION.

COMPLAINT

g.  Defendants subsequently invested Plaintiff's money in the movie "I Alex Cross" for their own benefit.

189.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Frozen Ground", money by doing acts, including, but not limited to, the following

a.  Defendants brought another investment opportunity to Plaintiff. Defendants showed Plaintiff an "Investment Agreement" between Georgia Film Fund Five, LLC and ENVISION dated September 26, 2011, to invest in the movie "Frozen Ground."

b.  Once again, Plaintiff executed on October 3, 2011, an "Assignment Agreement" with Envision to invest $4,000,000 USD for the portion of movie rights to "Frozen Ground."

c.  On October 3, 2011, Plaintiff sent $4,000,000 USD through a foreign wire transfer to ENVISION.

d.  Defendant MARTIROSIAN once again stated that there was a buyer for the movie "Frozen Ground."

e.  On May 29, 2012, Plaintiff executed a Purchase Agreement with Canal Group, LLC, with ENVISION as Escrow Agent, for $13,100,000 USD.

f.  Defendants represented that $13,100,000 USD was transferred via interstate wire transfer from Canal Group to ENVISION.

33

g.  Defendants subsequently invested Plaintiff's money in the movie "Frozen Ground" for their own benefit.

190.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Broken City", money by doing acts, including, but not limited to, the following:

a.  Defendants presented an Investment Agreement dated October 3, 2011, between Georgia Film Fund Fifteen LLC and ENVISION as evidence to demonstrate that ENVISION had legal rights to the production of the film.

b.  On October 21, 2011, Plaintiff and ENVISION signed an Agreement titled "Enclosure No. 6 To Production Financing Agreement dated as of April 05, 2011" for the movie "Broken City" with a proposed investment of $8,000,000 USD.

c.  On October 20, 2011, Plaintiff transferred $8,000,000 USD via foreign wire transfer to ENVISION's account number ending in 6000 at Comerica Bank.

d.  On December 21, 2012, Plaintiff purchased additional rights from ENVISION for $1,250,000 USD.

e.  Defendants subsequently invested $8,700,000 USD into the movie "Broken City" for his own benefit and not as per the "Assignment Agreement."

f.  Defendants took the $9,250,000 USD and then invested Plaintiff's money for themselves in "Broken City".

34

COMPLAINT

191.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Tomb" by doing acts, including, but not limited to, the following:

a.   Defendants presented an Investment Agreement dated February 15, 2012, between Georgia Film Fund 12 LLC and ENVISION as evidence to demonstrate that ENVISION had legal rights to the production of the film.

b.   On March 19, 2012, Plaintiff and ENVISION signed an Assignment Agreement for the movie "Tomb" with a proposed investment of $9,400,000 USD.

c.   On March 16, 2012, Plaintiff transferred $9,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank, of which $7,000,000 USD was intended for investment into the movie "The Tomb," and $2,000,000 USD was transferred for the anticipated investment into a future movie titled "Empire State."

d.    Defendants stated the remaining $2,400,000 USD of the investment would be paid from the proceeds of sales of Plaintiff's movies.

e.   Subsequently, Defendants came up with a plan to have Plaintiff trade his rights to the movie "Tomb" to rights in other movies.

f.   On March 3, 2013, a Profit Participation Agreement was reached with Filmworks Group Ltd. and Plaintiff exchanging profits for Plaintiff's movies "Empire State" and "Tomb" for Filmworks movies "Slaughterhouse," "We Kill Monsters," "Day 38," and "November Man."

COMPLAINT

     g.   Defendants subsequently invested Plaintiff's money in the movie "Tomb" for their own benefit.

192.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Empire State", money by doing acts, including, but not limited to, the following:

     a.   Defendants presented an Investment Agreement dated April 5, 2012, between Georgia Film Fund Fifteen LLC and ENVISION as evidence to demonstrate that ENVISION had legal rights to the production of the film "Empire State."

     b.   On July 16, 2012, Plaintiff and ENVISION signed an Assignment Agreement for the movie "Empire State" with a proposed investment of $6,000,000 USD.

     c.   On July 13, 2012, Plaintiff transferred $2,000,000 USD via foreign wire transfer to ENVISION's account number ending in 6000 at Comerica Bank.

     d.   On March 16, 2012, Plaintiff transferred $9,000,000 USD to ENVISION's account number ending in 6000 at Comerica Bank, of which $7,000,000 USD was intended for investment into the movie "The Tomb," and $2,000,000 USD was transferred for investment into "Empire State."

     e.   Defendants stated the remaining $2,000,000 USD of the investment would be paid from the proceeds of sales of Plaintiff's movies.

193.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and

on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Two Guns", money by doing acts, including, but not limited to, the following:

a. In early 2012, Defendants brought another investment opportunity to Plaintiff to invest in the movie "Two Guns."

b. Defendants changed the scheme in this opportunity and made it seem as if Plaintiff was investing with movie studios directly.

c. On April 1, 2012, Plaintiff entered into an "Investment Agreement" with Georgia Film Fund Fifteen LLC, and Universal Studios to invest $16,700,000 in the movie "Two Guns" for 120% recoupment of the investment and then 40% of the gross profits.

d. Also, on April 1, 2012, Parties signed an "Addendum to the Investment Agreement" which stated that the $16,700,000 USD shall be transferred to ENVISION's account.

e. On May 15, 2012, Plaintiff transferred $6,500,000 USD via foreign wire transfer to ENVISION's account number ending in 6000 at Comerica Bank.

f. Defendants then represented that ENVISION had an additional 10% interest in the movie from Georgia Film Fund Fifteen LLC.  Defendants showed Plaintiff a Memorandum of Agreement demonstrating the additional interest signed December 12, 2012.  ENVISION represented that they purchased the interest for $11,880,000 USD.

COMPLAINT

g.  On December 21, 2012, Plaintiff signed an "Assignment Agreement" with ENVISION for the additional 10% for $5,940,000 USD.

h.  On January 17, 2013, Plaintiff transferred $5,940,000 USD via foreign wire transfer to ENVISION's account number ending in 6000 at Comerica Bank.

i.  At all times Defendants knew these contracts to be false and fraudulent.

194.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Lone Survivor", money by doing acts, including, but not limited to, the following:

a.  Defendants brought forth another investment opportunity for Plaintiff.  Defendants presented an Investment Agreement dated July 26, 2012, between Georgia Film Fund 17 LLC and ENVISION as evidence to demonstrate that ENVISION had legal rights to the production of the film "Lone Survivor".

b.  On October 18, 2012, Plaintiff and ENVISION signed an Assignment Agreement for the movie "Lone Survivor" with a proposed investment of $17,400,000 USD.

c.  Plaintiff made the following payments totalling $12,500,000 USD in foreign wire transfers as follows:

      i.  August 14, 2012 - $1,500,000 USD
     ii.  August 22, 2012 - $1,500,000 USD
    iii.  August 30, 2012 - $2,000,000 USD
    iv.  September 18, 2012 - $4,000,000 USD
     v.  October 5, 2012 - $2,000,000 USD
    vi.  October 12, 2012 - $500,000 USD
   vii.  October 17, 2012 - $1,000,000 USD

COMPLAINT

d. On or about March 30, 2014, Defendants represented that they had found a buyer for the Assignment rights to the movie "Lone Survivor."

e. On March 30, 2014, a Purchase Agreement between Plaintiff and a fictitious company called Canal One, LTD, with ENVISION acting in the capacity of escrow agent, was signed.

f. Defendants represented that Canal Group, LLC, transferred $18,100,000 USD to ENVISION's account number ending in 6000 at Comerica Bank.

g. However, in fact, there was no transfer of $18,100,000 USD by Canal Group, LLC to ENVISION.  Defendants made the false statement to entice Plaintiff to invest more money.

195.   Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Convention", money by doing acts, including, but not limited to, the following:

a. Defendants brought forth another investment opportunity for Plaintiff.  Defendants wanted Plaintiff to invest in a movie called "Convention."

b. On August 1, 2013, Plaintiff executed an Investment Agreement with Convention Productions LLC for an investment of $12,300,000 USD.

c. Plaintiff paid the investment through foreign wire transfers as follows:

   i. December 17, 2012 - $4,700,000 USD
   ii. April 25, 2013 - $3,400,000 USD
   iii. August 15, 2013 - $1,250,000 USD – ($1,000,000 USD was intended in movie titled "Convention)

COMPLAINT

iv.  September 17, 2013 - $1,000,000 USD

   d.  On September 10, 2015, Plaintiff entered into a Purchase Agreement with C&C Productions LLC.

196.   Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Sin City 2", money by doing acts, including, but not limited to, the following:

   a.  Defendants brought forth another investment opportunity, an investment in the movie "Sin City 2."

   b.  On October 10, 2013, Plaintiff entered into an Acquisition Agreement with Alastair Financial Services for rights to "Sin City 2."

   c.  On April 18, 2014, Plaintiff signed a Mutual Assignment Agreement with TWG Inc.

   d.  Plaintiff Invested $15,230,000 USD through foreign wire transfers follows
      i.  December 17, 2012 - $1,100,000 USD
     ii.  February 8, 2013 - $6,600,000 USD
    iii.  October 17, 2013 - $7,530,000 USD

   e.  On April 18, 2014, Pulham signed an agreement with TWG, Inc. to exchange the movie rights for "Sin City" for those of "Inversion".

197.   Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in

COMPLAINT

furtherance to defraud Plaintiff of its investment in the movie "And So It Goes", money by doing acts, including, but not limited to, the following:

    a.   Defendants brought forth another investment opportunity to invest in a film "And So it Goes." To demonstrate that Defendants had the rights, they showed an Investment Agreement between ENVISION and ASIG Distribution LLC.

    b.   On April 03, 2013, Plaintiff entered into an Assignment Agreement with Envision and for the rights to "And So it Goes." Plaintiff was to invest $2,650,000 USD.

    c.   Plaintiff invested $2,000,000 USD via foreign wire transfer on September 18, 2012.

    d.   Soon thereafter, Defendants stated that there was a buyer for the film.

    e.   On March 10, 2014, Plaintiff executed a Purchase Agreement with AIG, to sell its rights to "And So it Goes" for $4,100,000 USD with ENVISION acting in the capacity of escrow agent.

198.    Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment in the movie "Pierre Pierre", money by doing acts, including, but not limited to, the following:

    a.   Defendants brought forth another investment opportunity, to invest in the movie "Pierre-Pierre."

    b.   On August 1, 2013, Plaintiff entered into an Investment Agreement with Pierre-Pierre Film LLC.

    c.   Plaintiff invested $1,000,000 USD by foreign wire transfer on April 17, 2012.

199.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff, and those acting in concert with and on behalf of them did unlawfully, knowingly, and intentionally use interstate wires in furtherance to defraud Plaintiff of its investment to invest in a company called "Base Animation Malaysia" by doing acts, including, but not limited to, the following:

a.  Defendants recommended another investment idea that Plaintiff invest in an animation specialty company.

b.  Defendants introduced Chris Bremble who owned an existing company named Base FX Ltd based in Beijing, China.

c.  On February 21, 2015, BASE FX LTD., and ENVISION entered into a Shareholder's Agreement for a company called Base Animation Malaysia, which was supposed to be registered in Malaysia but because of delays was registered in the state of Colorado.

d.  Plaintiff invested $6,000,000 USD through foreign wire transfers as follows:
    i.   February 2, 2015 - $1,500,000 USD
    ii.  February 2, 2015 - $1,500,000 USD
    iii. October 15, 2015 - $1,000,000 USD
    iv.  November 4, 2015 - $1,000,000 USD
    v.   November 11, 2015 - $1,000,000 USD

e.  A search of the Malaysian business entity search found no such company as Base Animation Malaysia.

200.     Plaintiff in total sent forty-three (43) foreign wire transfers to Envision for its racketeering activities.

COMPLAINT

**CONTINUITY AND RELATEDNESS OF THE PATTERN OF RACKETEERING**

201.     Each of the foregoing acts of racketeering by Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff and those acting in concert with and on their behalf in furtherance of the common purpose defrauding Plaintiff out of its money and then taking its money to invest in the movie business for Defendants' own benefit was unlawfully, fraudulently and intentionally related, continuous and a pattern of conduct to defraud Plaintiff of its money through an elaborate scheme of (1) setting up fraudulent contracts and making it seem as if those companies had an investment agreement to sell the rights to ENVISION, (2) convincing  Plaintiff to purchase the rights by investing money, (3) having Plaintiff sell those rights to a fictitious company represented by Defendants and those acting in concert with and on his behalf, and, (4) after the sale, Defendants taking Plaintiff's money to invest for themselves.

202.     Plaintiff is informed and believes that Defendants unlawfully and intentionally operated this racketeering activity through the use of foreign and interstate wire fraud and transportation of stolen property in order to hide the assets from this fraud. Defendant MARTIROSIAN worked in this racketeering enterprise with Defendants WESTWOOD, GASPARYAN AND ENVISION.

**RICO INJURY**

203.     As a direct and proximate result of Defendants' willful and unlawful participation in this enterprise to defraud Plaintiff of his investment through a pattern of racketeering

43

activity in violation of 18 USC § 1962(c), Plaintiff has been injured in business and property.

204.     As a direct and proximate result of Defendants' willful and unlawful participation in this enterprise to defraud Plaintiff of his investment through a pattern of racketeering activity in violation of 18 USC § 1962(c), Plaintiff has been injured in amount of at least $98 million to be determined at trial.

## COUNT II.
## RICO CONSPIRACY

205.     Plaintiff hereby incorporates all the allegations in paragraph 1-204 as if set forth herein.

206.     This cause of action against Defendants MARTIROSIAN, WESTWOOD, GASPARYAN AND ENVISION to conspire among themselves to undertake the enterprise mentioned above in violation of 18 USC § 1962(d).

207.     Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION together with others known and unknown to Plaintiff have unlawfully, fraudulently and intentionally conspired together to plan and perpetrate a fraudulent scheme to carry out the common purpose their enterprise.  The common purpose was to fraudulently induce Plaintiff to think that they are investing money in the movie business, then have them sell their rights to a fictitious company, meanwhile Defendants MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION, steal the money for their own use and to invest themselves in the movie business and take the profits from the movies.

208.     As a direct and proximate cause of MARTIROSIAN, WESTWOOD, GASPARYAN and ENVISION's wrongful actions described herein, Plaintiff has been

44

damaged over $100,000,000.  This includes the initial investment of $98,000,000 and stolen profits from the movies that Plaintiffs would have invested in if not for the fraud.

## COUNT III.
### FRAUDULENT/INTENIONAL MISPREPRESENTATION
### As to All Defendants

209.     Plaintiff hereby incorporates all the allegations in paragraph 1-208 as if set forth herein.

210.     Defendants had a well devised scheme to defraud Plaintiff out of their money to then steal the investment and then invest for themselves.

211.     Defendants MARTIROSIAN and WESTWOOD made statements that Defendant ENVISION had rights to certain movies.  They even went so far as to have fraudulent contracts with fictitious companies.

212.     At all times Defendants knew that ENVISION had no movie rights.  All contracts, and statements made by Defendants stating that ENVISION had movie rights in various movies were false and known to be false.

213.     Defendants made these statements so as to induce Plaintiff into making an investment into the movies.

214.     Based on their fraudulent statements, Plaintiff invested $98,000,000.

215.     Plaintiff has been damaged in the amount of at least $98,000,000 because of the fraudulent and intentional misrepresentations made by Defendants.

45

## COUNT IV
## FRAUDULENT/INTENIONAL MISPREPRESENTATION
### As to All Defendants

216.     Plaintiff hereby incorporates all the allegations in paragraph 1-215 as if set forth herein.

217.     After Plaintiff invested in various movies, Defendants made fraudulent and intentional misrepresentations that there were buyers for the movies.

218.     Defendants drafted and showed Plaintiff purchase contracts for the purchase of various movies.

219.     Defendants knew that there were no buyers for the Plaintiff's movie rights and the contracts shown to support Defendants' representations made to Plaintiff were fraudulent.

220.      Defendants knew that their representations that there were buyers for the movie rights were fraudulent.

221.     Plaintiff relied on statements and misrepresentations made by the Defendants to sign away their rights to the movies.

222.     Defendants made these fraudulent and intentional misrepresentations in order to induce Plaintiff to sell their rights in the movies.

223.     Had it not been for the misrepresentations and statements made by the Defendants, Plaintiff would have never sold its rights to the movies.

224.     As such, Plaintiff has been damaged in an amount to be proven at trial because of the deceitful and willful misrepresentations made by the Defendants.

COMPLAINT

**COUNT V**
**CONVERSION**
**As to All Defendants**

225.     Plaintiff hereby incorporates all the allegations in paragraph 1-224 as if set forth herein.

226.     By the fraudulent acts of the Defendants in enticing Plaintiff to provide them with money and then taking Plaintiff's money to use for their own benefit, Defendants unlawfully exercised ownership, dominion, or control over personal property which rightfully belonged to Plaintiff.

227.     Defendants' unlawful exercise of such ownership, dominion, or control deprived Plaintiff receipt of such property which rightfully belonged to them.

228.     As such, Plaintiff has been damaged in an amount to be proven at trial.

CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that this Court:

1. Award Plaintiff any and all financial, economic and compensatory damages entitled to by law, at least $125,000,000, on each of Counts I and II and III and IV in addition;

2.  Award Plaintiff other monetary damages that they may be entitled to under the law; in addition

3. Award appropriate pre-judgment and post judgment interest; in addition

4. Award expert fees and attorney's fees and cost of this action as may be permitted by law; in addition

5. Award any other relief the Court deems just and appropriate.

47

## JURY TRIAL DEMANDED

PLAINTIFF DEMANDS A JURY BY TRIAL ON ALL COUNTS.


Respectfully Submitted,

/S/ FAISAL GILL_____
Faisal Gill (SBN 463416)
Gill Law Firm
11330 Ventura Blvd
Studio City, CA 91604
310-418-6675
202-318-5331 (fax)
Fgill@glawoffice.com

48

COMPLAINT